[File No. 7247]

WILLIAM LANGER, Appellant, v. ISABEL LEMKE, Administratrix of the Estate of William Lemke, deceased, (substitute party) and The Land Finance Company, Respondents.

(50 NW2d 641)

384

Opinion filed Nov. 1, 1951

*J. F. X. Conmy* and *Francis Murphy,* for appellant.

*Charles G. Bangert,* for respondent.

MORRIS, C. J. The defendant, the Land Finance Company, is a corporation organized under the laws of the State of South Dakota with its office and principal place of business at Fargo, in North Dakota. In 1922 the assets of the corporation consisted of large holdings of land in Mexico. In 1907, 1908, and 1909 the

plaintiff, William Langer, became the owner of some 1400 shares of stock in the Land Finance Company. The subject of this suit is the ownership and right to possession of the certificates representing the stock.

At the request of the plaintiff, the defendant, Willian Lemke, who during all of the times involved in this action was president of the defendant corporation, called a special meeting of the directors and stockholders of the corporation which was held at Devils Lake, North Dakota, on the 22nd of November, 1922. At that meeting a resolution was unanimously passed granting to the stockholders the privilege of exchanging their stock for land owned by the corporation. There was also passed a resolution directing the president to assume responsibility as to how selection was to be made so as not to injure the balance of the property. The plaintiff immediately served notice on the corporation that he had selected land in what is known as the Marquez Tract. Thereafter, negotiations took place between the plaintiff and the president of the company regarding the terms of a contract under which the plaintiff was to make a selection of land in exchange for his stock. These negotiations culminated in a meeting between the plaintiff and the president of the company at the latter's home in Fargo, on December 29, 1922, at which time a written agreement was entered into denominated "Contract for Deed," which purports to have been entered into between the defendant Land Finance Company by and through its president, William Lemke, as party of the first part, and the plaintiff, as party of the second part. After reciting that the party of the second part is the owner and holder of certain stock therein listed and that the party of the second part is entitled to certain cash credits which are also listed, the contract recites:

"Now Therefore, it is agreed by the party of the first part that the party of the second part: (1) Is entitled to have stock issued to him for the above cash credits, in the Land Finance Company, (2) Party of the second part having given notice to the Board of Directors, as provided by the by-laws, Articles of Incorporation, and stock certificates of the Land Finance Company, that he intends to and desires to exchange his stock for

land which the company holds in Mexico, and a resolution having been passed by the Board of Directors of said first party fixing the price of the land, and authorizing its President, Wm. Lemke, to accept stock certificates from stockholders at twice their face value, plus accumulative dividend of seven per cent per annum, on said certificates, in payment for said land, Therefore, the party of the first part hereby agrees to execute a deed under the form and laws of the Republic of Mexico granting, bargaining, selling and conveying unto the party of the second part, in accordance with the laws of the Republic of Mexico, and the State of Nayarit, and in accordance with the by-laws, articles of incorporation, stock certificates and resolutions of the party of the first part a definite number of acres of land to be selected from the grazing lands known as the Marquez tract, which tract is owned by the party of the first part, and which land shall be selected in such manner as not to permanently or materially injure the remainder of the tract, and shall consist of a fair average of the entire tract, and the total of all of the said lands so selected shall not take more of the front of the Santiago River than the total acres shall proportionately be to the sum of Four Hundred and Sixty-six Thousand (466,000) acres, which said Marquez tract contains. The party of the second part is to have ten months from date to make his selection, provided, however, that if the party of the first part has an opportunity to sell the entire property before such selection is made, it may do so. The agreed price at which said land is to be exchanged is One Dollar and twelve cents ($1.12) per acre. It is further agreed if the party of the second part and the party of the first part cannot agree as to the selection and location of said land, that the same shall then be submitted to a Board of arbitrators consisting of three members, one to be selected by the party of the first part, one by the party of the second part, and the two to select a third, all of whom shall be stockholders in the Land Finance Company. It is further agreed that the party of the first part will accept the above enumerated Preferred Stock certificates at twice their face value, plus accumulative dividends, in payment for said lands, and that the Common Stock will be accepted at the amount

actually paid for it, that is of the value of ten ($10.00) Dollars a share.

"It is further agreed that the said party of the first part is to have its manager, Edwin Musick, located at Concha, Mexico, or some other party to be agreed upon to accompany the said party of the second part or his agent in making the selection, the said party of the second part paying his own expenses. It is further agreed that the said party of the second part shall pay for the survey of his land, but that every assistance shall be given him by the party of the first part, and the party of the first part shall furnish the party of the second part a complete abstract of title showing said property to be clear from any and all incumbrances.

"Dated this 29th day of December, 1922."

This agreement was signed "Land Finance Company" by "William Lemke, President," and a signed copy given to the plaintiff, who took it with him. At the time this contract was executed the plaintiff turned over to the defendant corporation and Mr. Lemke, as its president, stock certificates representing the stock involved in the transaction. The stock certificates were not indorsed by the plaintiff and no transfer of the stock was ever entered upon the records of the corporation, except a penciled mark on the stock record indicating that the stock has been cancelled. The defendants contend that as a result of the transaction of December 29, 1922, the Land Finance Company became the absolute owner of the stock in question.

The plaintiff brought this action for restitution of the stock and asks the court to decree that the agreement of December 29, 1922, is invalid or has been rescinded, abrogated, and cancelled. The trial court denied the plaintiff relief and dismissed his cause of action. From the judgment so providing, the plaintiff has appealed.

The plaintiff vigorously attacks the agreement of December 29, 1922, upon several grounds, the theory of his case being that if that agreement can be disposed of he will be entitled to a return of his stock certificates held by the Land Finance Company. He first asserts that this agreement never constituted a valid contract. In the lower court he urged that it was ultra

vires and was signed only by one party thereto, the defendant corporation. These points have been abandoned on this appeal, but the plaintiff still urges that there never was a meeting of minds and that the contract must fail because of uncertainty. The agreement in question is in the form of a bilateral executory contract, under which certain specified shares of stock in the Land Finance Company were to be exchanged for land in the Marquez Tract. The value of the stock and the price per acre of the land to be exchanged is provided for. The obligation was placed upon the land company to execute a deed as prescribed in the contract,. and it was even provided that if the parties could not agree upon selection and location of the land to be exchanged, the matter should be submitted to a board of arbitrators, selected as provided in the contract. Despite the care with which mutual obligations were expressed, it seems that a dispute arose with regard to the payment of costs incidental to a survey of the land to be selected by the plaintiff. The contract provided that: "the said party of the second part shall pay for the survey of his land, . . . ." It also provided that: "the total of all of the said lands so selected shall not take more of the front of the Santiago River than the total acres shall proportionately be to the sum of Four Hundred and Sixty-six Thousand (466,000) acres, which said Marquez tract contains."

Because of this last provision, the parties considered it necessary to survey the entire frontage of the Marquez Tract on the Santiago River in order to determine what frontage on that river the plaintiff was entitled to incorporate in the tract or tracts selected by him. Mr. Langer testified:

"Yes, when I wished to survey out my land Mr. Lemke wanted to have more discussion about it and then he went to Mexico, and I planned to join him there and get my share of this property, and he wrote me in Mexico that he had seen a surveyor by the name of either Art Thomas or Art Thompson, and that the total cost of surveying this entire tract would be approximately $30,000.00 Mexican money which at that time was between $6,-000.00 and $7,000.00 in American money."

"Mr. Lemke said the company had no money with which to pay for it and wanted me to pay for it."

Mr. Lemke, on the other hand, denied that there was a dispute over the survey. Regardless of such misunderstanding as may have developed with regard to the detail of the survey, the contract is definite as to the chief consideration, which consisted of the mutual obligation to exchange land for stock. The subject matter of the contract is definitely described. The mere fact that the contract may be indefinite or ambiguous in some detail that later results in a dispute between the parties does not necessarily render the contract void for lack of mutuality or meeting of the minds. The contract is not void because of uncertainty.

The plaintiff further contends that he never signed the contract in question and that it is therefore not binding upon him. Under the circumstances his signature was not necessary in order to bind him as a party to the contract. He participated in its preparation and accepted the contract after it had been signed by the Land Finance Company. He also partly performed his obligations under it by turning over to the company the stock certificates representing the stock covered by the contract. Thereafter he entered into negotiations with the president of the company with regard to the selection and survey of lands that he was to receive. He will not now be heard to contend that the contract was not binding upon him because of his failure to sign it. Reed v. Coughran, 21 SD 257, 111 NW 559.

The plaintiff's next contention is that if the contract was valid in the first instance, it was afterwards abrogated or rescinded by the acts of the parties. The case was tried to the court and to a jury, to which was submitted a special verdict consisting of ten questions. These questions and the jury's answers are as follows:

"Question No. 1: Did the Plaintiff, William Langer, return to the Defendants the contract marked Exhibit Z-4 dated December 29, 1922? No.

"Question No. 2: If you find that the Plaintiff, William

Langer, returned the contract, when did he return it? See question number one.

"Question No. 3: Did the Defendants by any of their acts or conduct lead the Plaintiff to believe that he was the owner of the Certificates of Stock involved in this action? Yes.

"Question No. 4: Did the Defendants ask the Plaintiff to pay or stand the expenses of a survey of more than the boundaries of the specific tract he was to acquire? Yes.

"Question No. 5: Did the Defendants by their acts or conduct lead the Plaintiff to believe that the Defendants had consented to the cancellation or abrogation of the contract dated December 29, 1922? Yes.

"Question No. 6: In what year did the Plaintiff first acquire knowledge that the Defendant Corporation claimed to own the Certificates of Stock involved in this action? 1945.

"Question No. 7: Did the Plaintiff do anything prior to instituting an action or lawsuit looking toward the return to him of the stock certificates in this action? Yes.

"Question No. 8: If you answer Question No. 7 in the affirmative, when was such action taken? 1937.

"Question No. 9: Did the Plaintiff, William Langer, enter into a contract with one Mr. Sullivan to sell to said Sullivan the land or a part of the land he was to receive from the Defendant corporation under the contract dated December 29, 1922? No.

"Question No. 10: Did the Plaintiff, William Langer, enter into a contract with one Mr. Sullivan to sell to Mr. Sullivan all or a part of the Certificates of Stock involved in this action? Yes."

The special verdict is of particular importance in that several of the answers bear upon the contention that the contract was abrogated or rescinded. Neither of the parties question the correctness of the jury's answers. But the plaintiff asserts that the court erred in disregarding the findings and the verdict of the jury. The answer to the first two questions negatives plaintiff's contention that he return the contract in question to the president of the company.

By its answer to the third question the jury found that the

defendants, William Lemke and the Land Finance Company, by their acts or conduct led the plaintiff to believe that he was the owner of the certificates of stock in question. By its answer to question 5 the jury found that the defendants led the plaintiff to believe that they had consented to the cancellation or abrogation of the contract. Whether the contract was cancelled or abrogated was a question for the court. Morrison v. Lee, 13 ND 591, 102 NW 223. The court found that it had never been rescinded, abrogated, or cancelled. Whether he was justified in so finding, despite the jury's answers to questions 3 and 5 of the special verdict, requires a review of the evidence on this point.

On April 3, 1931, Mr. Lemke wrote to the plaintiff asking him for $300.00 to help pay the taxes on the Mexican land. As an alternative to paying the $300.00, Mr. Lemke suggested that the plaintiff give him an option for one year and stated: "I will offer to try and get some one, and I think I can before the year is up who will pay you $5,000.00 for the interests which you represent." He enclosed a blank form which he asked the plaintiff to sign and which provided in part: "I, William Langer, of Bismarck, North Dakota, in consideration of $1.00 to me in hand paid, and other considerations, do hereby give to William Lemke, of Fargo, North Dakota, an option for one year within which to purchase all my interests in any and all of the lands held by the Land Finance Company in Mexico, and to purchase within one year the following shares of stock held by myself and relatives and friends." Then followed a list of stock certificate numbers which are substantially the same as those contained in the agreement of December 29, 1922. Mr. Langer did not sign the option.

In November 1939 Mr. Lemke prepared and filed before the Agrarian Claims Commission of the United States and Mexico a statement of the stock ownership of the Land Finance Company in which he listed William Langer as being the owner of 1417½ shares. Mr. Lemke testified that this listing was a clerical error and he later corrected it by filing a subsequent affidavit.

In 1941 Mr. Lemke testified at a hearing before the Committee on Privileges and Elections of the 77th Congress in connection with a protest to the seating of William Langer as a senator from North Dakota. During an inquiry concerning the

ownership of Mexican land by the Land Finance Company, Mr. Lemke was asked: "How much of the stock in this corporation did Mr. Langer own?" To which the witness replied: "I have handed you a list which shows some $38,000 worth that is in his name personally. Besides that he controls that of his father and sister and brothers, brother-in-laws, which would amount to about roughly $15,000 or $20,000 more."

Mr. Langer, in his testimony, summarizes the contention that the agreement of December 29, 1922, was abrogated in these words: "Whatever you want to call it. A contract or agreement has been abrogated. It is quite simple. Mr. Lemke went to Mexico. I was supposed to meet him down there. When he left I assumed, of course, he was going to pay for surveying the Santiago River and his share of the entire tract of which I would pay for the surveying of whatever part I got for my stock. Shortly after he went down to Mexico he wrote me he had considered Art Thomas or Art Thompson to do the surveying and that it would cost $30,000.00 Mexican money or between $6,000.00 or $7,000.00 which at that time was the exchange in United States money, to make that survey and he expected me to pay for all of it. Of course, I wouldn't do that so I didn't go down. Now when Mr. Lemke and I, we had various conversations about it. We took up this matter of Pan-American for one thing. Later on he said he had some people from Chicago and New York who were interested in it, and those fell through. Sometime later in any event I returned the contract to him and asked him to return the stock to me. I assumed it was returned."

The Land Finance Company retained possession of the stock certificates at all times since 1922. That retention in itself tends to negative an intention on the part of the company to abrogate the contract. The return of the stock and its acceptance by plaintiff would have placed the parties in statu quo and would have signified a mutual intention to abrogate. But what of the statements and conduct of Mr. Lemke, president of the Land Finance Company? The plaintiff contends that Mr. Lemke's statements with reference to the plaintiff's ownership of the stock indicate that the contract was abrogated. That is a possible but not the most reasonable deduction to be made from

those statements. Reference to the proposed option which Mr. Lemke prepared and sent to Mr. Langer is illuminating. It is true, as plaintiff argues, that it recognizes that the plaintiff is the owner or at least has an interest in the stock. But the option also refers to "all my interests in any and all of the lands held by the Land Finance Company in Mexico." Thus it recognizes that the plaintiff had an interest in the land, as well as the stock. The only interest in the land that the plaintiff could have acquired was by virtue of the agreement of December 29, 1922. If that agreement had been abrogated, the plaintiff would have had no interest in the land. His only interest in the company would be through his ownership of stock. The option agreement is evidence of the continued existence of the agreement of December 29, 1922, rather than its abrogation. The option, referring as it does to both land and stock, is consistent with but one situation which Mr. Lemke no doubt recognized at the time he drew the option. The stock had been turned over to the Land Finance Company as the first step in exchanging stock for land, as provided in the agreement. By virtue of the agreement the plaintiff became entitled to an inchoate interest in the land of the Marquez Tract, a considerable portion of which was to be deeded to the plaintiff as soon as he selected, surveyed, and identified the tracts which he desired to obtain. Until that was done the plaintiff still had an interest in the stock, the possession of which he had surrendered in the form of unindorsed certificates. From all the circumstances we conclude that the parties did not intend that the company should own the stock outright until the company had performed its part of the agreement by deeding selected lands to the plaintiff. This is consistent with the prospective wording of the contract and with the fact the plaintiff did not indorse or assign the certificates in writing. On the other hand, the company did have possession, which it was entitled to retain until the contract was performed or abrogated. If the contract was performed, the company became the absolute owner of the stock. Pending performance, Mr. Langer had an interest in both stock and land. The option was clearly intended to cover the plaintiff's interest in both stock and land. It points to the continued existence of, rather

than the abrogation of the agreement and is not inconsistent with Mr. Lemke's testimony before the congressional committee.

We reach the conclusion that the agreement of December 29, 1922, was valid in its inception and was not abrogated or cancelled by mutual consent or agreement of the parties.

The plaintiff's next contention is that the Land Finance Company breached the agreement and that this breach entitled the plaintiff to rescind the contract and obtain restitution of his stock. Where a party to a contract is prevented by the wrongful act of the other party from performing the contract, he may treat the contract as rescinded. Bryan v. Northwest Beverages, 69 ND 274, 285 NW 689, 123 ALR 717. Damages and restitution are alternative remedies for material breaches of bilateral contracts. Restatement of the Law, Contracts, Sections 384 and 397; Williston on Contracts, Revised Edition, Volume 5, Section 1455.

As a basis for the breach, the plaintiff relies upon the answer of the jury to question 4 to the effect that the defendants asked the plaintiff to pay or stand the expenses of a survey of more than the boundaries of the specific tract he was to acquire. Accepting the jury's determination of this fact, does it follow that such a breach resulted as to entitle the plaintiff to rescission and restitution? We think not. In the first place, the survey was but an incident to the main purpose of the contract, which was the exchange of land for stock. It does not appear that the plaintiff made any effort to resolve the difference over the matter of payment for the survey. According to his own testimony, the plaintiff was to go to Mexico in connection with the selection and survey of the land that was to be deeded to him. He did not go; nor does it appear that he at any time made an effort to select or to survey the tract or tracts which he wanted. A party who would rescind a contract because of the default of the other party must show that he has done all that he is required to do in order to entitle him to performance. Stadelmann v. Boothroyd, 170 Minn 430, 212 NW 908; 12 Am Jur, Contracts, Section 438; 17 CJS Sections 422 and 423. The plaintiff has not used diligence in attempting to secure the survey and select the lands which he was to receive in exchange for his stock and is not in a posi-

tion to demand restitution upon the ground of material breach of the agreement.

A mere dispute regarding an incidental portion of a contract which involves only the payment of money does not justify a rescission. Harper v. Battle, 180 NC 375, 104 SE 658, 20 ALR 357; Blake v. Osmundson, 178 Iowa 121, 159 NW 766; White v. Massee, 202 Iowa 1304, 211 NW 839, 66 ALR 1434; Fay v. Oliver, 20 Vt 118, 49 Am Dec 764; Lewis v. New York Life Ins. Co., 181 F 433, 30 LRA NS 1202; Klapka v. Shrauger, 135 Neb 354, 281 NW 612; Long v. Long (Mo) 121 SW2d 800; Rozzano v. Moore, 175 Wash 566, 27 P2d 1096; 12 Am Jur, Contracts, Section 440; 17 CJS, Contracts, Section 422; 12 CJS, Cancellation of Instruments, Section 29.

A major contention of the appellant is that he is entitled to a return of the certificates of stock because of the provisions of Section 10-1807 RCND 1943 which in part provides that if the indorsement or delivery of a certificate of stock was procured by fraud or duress, or was made under such mistake as to make the indorsement or delivery inequitable, the possession of the certificate may be reclaimed and the transfer rescinded, unless the certificate has been transferred to a purchaser for value in good faith without notice of the facts making the transfer wrongful, or the laches of the injured person prevents relief. This section came into our law as a part of Chapter 102, SLND 1943, and is a legislative adoption of Section 7 of the Uniform Stock Transfer Act. Uniform Laws Annotated, Volume 6, Page 12. It does not apply to the facts before us for it does not appear that the delivery of the certificates of stock was procured by fraud or duress, or was made under such a mistake as to make the indorsement or delivery inequitable. No fraud, duress, or mistake appears in connection with the making of the contract. After it was made, a dispute arose as to who was to pay for certain survey work. Otherwise the contract appears to have been agreeable to all concerned. Surveying was an incident to carrying out the contract and not a major object or purpose sought to be accomplished by the parties. The dispute as to who was to pay the cost of surveying the frontage of the Marquez Tract along the Santiago River does not afford the plaintiff

grounds for rescinding the contract, either under the general law of rescission or under Section 10–1807 RCND 1943.

The trial court found that the contract in question has never been cancelled, rescinded, or abrogated. With that finding we wholly agree. Upon it we reach the conclusion that the contract is still in full force and effect and that the Land Finance Company is entitled to retain possession of the stock certificates.

The defendants, among other things, pled the statute of limitations and alleged that no part of the plaintiff's cause of action accrued within ten years next preceding the commencement of this action. The trial court found in favor of the defendants on this point. His findings were based upon the answers contained in the special verdict of the jury to questions 6, 7, and 8, wherein the jury said that the plaintiff first acquired knowledge that the defendant corporation first claimed to own the certificates of stock in 1945, and that in 1937 the plaintiff took action toward the return to him of the stock certificates. Upon his findings, which were based upon the special verdict, the trial court reached the conclusion of law, "That all the causes of action, or alleged causes of action of the plaintiff, are barred by the Statute of Limitations of the State of North Dakota." Under our determination that the contract has never been rescinded, abrogated, or cancelled, the defense of the statute of limitations becomes wholly immaterial. No cause of action for the return of the stock has been established upon which a statute of limitations might operate. The plaintiff has expressed concern lest the conclusion of law which we have quoted above could be said to bar the plaintiff from any future action on the contract or for a breach that might hereafter occur. The conclusion to which the plaintiff objects was not incorporated into or made a part of the judgment. The judgment dismisses the complaint and awards costs. It makes no other determination. We reach the conclusion that the contract made between the parties on December 29, 1922, has never been rescinded, abrogated, or cancelled; that the plaintiff is not now entitled to a judgment of rescission; and that the contract remains in full force and effect. We further determine that the plaintiff is not entitled to a return of the stock certificates which he turned over to the Land Finance Company at

the time of entering into the contract. We make no further determination. The judgment appealed from is affirmed.

CHRISTIANSON, SATHRE and BURKE, JJ., and NELSON, Dist. J., concur.

GRIMSON, J., being disqualified, did not participate, Hon. HAROLD B. NELSON, Judge of Second Judicial District, sitting in his stead.